IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| In Re:<br><br>JAMES LAWRENCE BRYANT, JR. and SHARON RENEA BRYANT a/k/a SHARON RENEA BLACKMON,<br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 25-10147<br><br>Chapter 7 |
| EASTWOOD CONSTRUCTION PARTNERS, LLC d/b/a EASTWOOD HOMES,<br><br>Plaintiff,<br><br>v.<br><br>JAMES LAWRENCE BRYANT, JR. and SHARON RENEA BRYANT a/k/a SHARON RENEA BLACKMON,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adversary Proceeding No. 25-02009 |

**PLAINTIFF EASTWOOD CONSTRUCTION PARTNERS, LLC'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Eastwood Construction Partners, LLC d/b/a Eastwood Homes ("Eastwood") submits this brief in support of its Motion for Summary Judgment on Eastwood's claim for willful and malicious injury under 11 U.S.C. § 523(a)(6) against Debtors James Lawrence Bryant, Jr. and Sharon Renea Bryant ("Defendants").

**NATURE OF THE MATTER**

For over two years, Defendants engaged in a campaign of tortious interference, defamation, and vexatious litigation against Eastwood. Defendants, themselves, have confessed that they "campaign[ed] to damage Eastwood's business and reputation in the neighborhood and on social media." ECF No. 3-3 at 2. As part of this campaign, they "approached Eastwood's customers and made negative comments about Eastwood, placed defamatory signs on their yards, and made

defamatory social media posts." *Id.* Their conduct "caused Eastwood to lose at least one contract for the purchase of a lot and home in Piper Village. Eastwood suffered damages in the amount of at least $74,400 in profit on the sale of the lot and home." *Id.* Defendants acknowledged that this amount of damages could be trebled under Chapter 75 of the North Carolina General Statutes, but confessed to a lesser amount of $150,000 in consideration of settlement. *Id.* at 3. Defendants executed such confession of judgment, "freely, knowingly, and voluntarily waiv[ing] with prejudice any right they may have [had] to appeal, modify, stay, or vacate" the same. *Id.* at 3-4. No genuine issue of material fact exists regarding whether Defendants' debt to Eastwood arises from willful and malicious injury. Moreover, Defendants are estopped from challenging the confession of judgment. Judgment in favor of Eastwood on its 11 U.S.C. § 523(a)(6) should be entered.

**STATEMENT OF UNDISPUTED FACTS**

**I.      Defendants contracted with Eastwood.**

Eastwood is the builder and seller of all residential homes in the Cottages at Piper Village ("Piper Village") in Trinity, Randolph County, North Carolina. ECF No. 31-1 ¶ 9. On or about June 25, 2022, Defendant James Lawrence Bryant, Jr. ("Mr. Bryant"), as buyer, and Eastwood, as seller, entered into a contract (the "Contract") for the purchase of real property at 5629 Siler Street, Trinity, NC 27370 (the "Residential Property"). *Id.* ¶¶ 8-10. Defendants closed on the Residential Property on July 29, 2022. *Id.* ¶ 14.

**II.     Defendants intentionally interfered with Eastwood's business and intended the resulting harm.**

On or around February 7, 2023, Mr. Bryant entered the Eastwood model home at Piper Village. ECF No. 31-1 ¶ 15. He began complaining to Eastwood's sales agent regarding the Homeowners Association ("HOA"), covenants ("Covenants"), the common areas of Piper Village,

2

and issues within the city of Trinity's jurisdiction – none of which were under Eastwood's control. *Id.* ¶¶ 15, 37; ECF No. 31-7, ¶¶ 4-6. Mr. Bryant told the sales agent that if did not get what he wanted, he would make it difficult for Eastwood to build and sell homes in Piper Village. ECF No. 31-3, ¶17.

Mr. Bryant's aggressive behavior made the sales agent uncomfortable. ECF 31-1 ¶ 15. As a result of this encounter, general counsel for Eastwood, Allen Nason, emailed a Notice of No Trespass to Mr. Bryant stating that Mr. Bryant was no longer authorized to enter onto any Eastwood property or approach any Eastwood employee within Piper Village, absent written approval. *Id.* Mr. Nason also provided Mr. Bryant with information regarding who to contact with respect to the Covenants, HOA matters, warranty matters, and any other issues. *Id.*

Mr. Bryant did not respond to Mr. Nason's February 9, 2023, email or contact any of the parties that Mr. Nason suggested. *Id.* ¶ 16. Instead, Defendants launched a coordinated campaign to malign Eastwood and damage its business and reputation, *Id.* ¶¶ 16-17, including:

1. Placing, and causing others to place, signs on the Residential Property's yard and other locations that used Eastwood's name in a defamatory, libelous and misleading manner. One of these signs read: "EASTWOOD SLAVE VILLAGE." *Id.* ¶ 15.

2. Harassing potential buyers and realtors viewing lots at Piper Village and explicitly telling them not to buy homes in Piper Village. *Id.* ¶ 17.

3. Planning and leading a rally where Mr. Bryant made defamatory statements about Eastwood and brandished a "glock" pistol while giving remarks. *Id.* ¶¶ 22-27.

4. Posting defamatory statements about Eastwood on Facebook and TikTok. *Id.* ¶¶ 22-23, 34-35.

In an email to neighbors, Defendant Sharon Renea Bryant ("Mrs. Bryant") boasted that their actions had caused harm to Eastwood. *Id.* ¶ 30 and Ex. D at 2. In closing her April 2023 email, Mrs. Bryant stated: "[W]e are winning the fight! One potential buyer has already cancelled her contract to build and another is strongly considering the same! We will continue to fight until justice is done!" *Id.*

Eastwood sent a formal cease and desist letter demanding that Defendants stop all threats to and harassment of Eastwood's employees, agents, or customers and any activity that defames, maligns, or otherwise impugns the character and good name of Eastwood, its homes, and its employees. *Id.* ¶33 and Ex. B at 4. Eastwood warned Defendants that their actions could affect Eastwood's customers, interfere with their business, and that "[e]very lost sale caused by anyone's unauthorized actions is being compiled as an item of damage." *Id.* ¶33 and Ex. B at 2-3. Defendants ignored the demand and instead continued with defamatory statements on social media and organized rallies against Eastwood. *Id.* ¶¶ 34-35.

## III. Eastwood files a lawsuit against Defendants.

Defendants' refusal to cease and desist and associated damages forced Eastwood, in April 2023, to file a complaint and motion for a temporary restraining order for tortious interference with contract, interference with prospective economic advantage, defamation, breach of contract, and unfair and deceptive trade practices in North Carolina Superior Court in Randolph County (23 CVS 867) (the "State Lawsuit"). *See* ECF 31-1. On April 27, 2023, Eastwood succeeded in obtaining a temporary restraining order ("TRO") against Defendants preventing Defendants from continuing to interfere with Eastwood's business. *See* ECF No. 31-2.

4

In June 2023, Eastwood and Defendants appeared before the Honorable Alyson A. Grine[1] on Plaintiff's Motion for Preliminary Injunction. ECF No.31-3. At that time, Judge Grine ruled from the bench that she would enter the preliminary injunction including the same terms as those in the TRO and that the TRO would remain in effect until the preliminary injunction was in place. *See id.*

The written Preliminary Injunction Order was entered on June 27, 2023. *See id..* The Preliminary Injunction Order is nearly identical to the TRO with respect to the enjoined acts. ECF No. 31-2 at 2-3 and ECF No.31-3 at 8-9. Moreover, the Preliminary Injunction Order makes findings of fact that (1) Defendants made disparaging statements about Eastwood; (2) Defendants approached Eastwood's customers and caused one customer to cancel the contract; and, after the TRO was entered, (3) Defendants continued to post disparaging statements about Eastwood and approach Eastwood customers. *Id.* at 9.

The day after the Preliminary Injunction hearing, Defendants violated the TRO and Judge Grine's oral ruling by posting defamatory signs in their yard intended to scare away Eastwood's customers. *See* ECF 31-5 at 3-5 and ECF 31-8.

Defendants noticed an appeal of the Preliminary Injunction Order and began to violate the terms of the Preliminary Injunction Order. ECF No. 31-4 at 6. Eastwood then moved for entry of injunction pending appeal on the same terms as the Preliminary Injunction Order. *Id.* at 1. The motion for entry of injunction pending appeal came on for hearing before Judge Keith Gregory on July 5, 2023, and he ruled that an injunction on the same terms as the Preliminary Injunction Order

---

[1] Mr. Bryant referred to Judge Grine's court as "kangaroo court," ECF No. 31-4. Ex. B, and that the decision handed down by Judge Grine was a modern day version of the infamous 1857 *Dred Scott* case.

would be granted. *Id.* at 7-8. The written order was entered on July 31, 2023 ("Injunction Pending Appeal"). *See* ECF No. 31-4.

Shortly after the Injunction Pending Appeal, Mrs. Bryant violated the Injunction Pending Appeal by making defamatory statements about Eastwood in social media posts. *See* ECF No. 31-6 at 7-8. Defendants also failed to take down their defamatory signs by at least July 25, 2025. *See* ECF No. 31-9 ¶ 4.

When Defendants failed to comply with the TRO, Preliminary Injunction Order, and Injunction Pending Appeal, Eastwood filed two motion to show cause. *See* ECF No. 31-5; ECF No. 31-5, ECF No. 31-8.

On September 5, 2023, Judge Gregory[2] heard the first Motion to Show Cause after Defendants were appointed counsel. At this hearing, Defendants consented to entry of orders of indirect criminal contempt for violation of the preliminary injunction and TRO with a suspended sentence of thirty days in jail and a one-year probation period. *See* ECF No. 31-10.

IV. **Defendants file frivolous counterclaims, lawsuits, and complaints against Eastwood.**

On May 19, 2023, Defendants retaliated against Eastwood with counterclaims in the State Lawsuit, alleging breach of contract, negligence, defamation, and unfair and deceptive trade practices. ECF No. 3-3 ¶ 9. On July 10, 2023, the Bryants filed their amended answer and counterclaims, adding new facts but no new claims. Eastwood moved to dismiss these counterclaims under Rule 12(b)(6). All claims but the breach of contract claim was dismissed by court order on November 22, 2023. ECF No. 31-21.

---

[2] Defendants also filed a frivolous complaint against Judge Gregory with the North Carolina Judicial Standards Commission after Judge Gregory ruled against them.

On July 31, 2023, the Bryants filed a lawsuit in the United States District Court in the Middle District of North Carolina (Case No. 1:23cv637) against Eastwood for federal racial discrimination claims, federal housing discrimination claims, housing discrimination claims under North Carolina law, and a North Carolina Unfair and Deceptive Trade Practices Act claim (the "Federal Lawsuit"). ECF No. 3-3 ¶ 11. Defendants also made frivolous complaints against Eastwood with the National Association for Advancement of Colored People ("NAACP"), ECF 31-6 at ¶20, the North Carolina Department of Justice, Federal Trade Commission, and United States Department of Housing and Urban Development, *id.* ¶ 16-1; ECF 31-13 at 1. None of these complaints resulted in any judgments, rulings, or other adverse actions against Eastwood.

### V.     Eastwood secures judgment against Defendants.

At the end of December 2023, the parties decided to resolve the parties' claims via settlement. ECF No. 3 ¶¶ 35-36. The Settlement Agreement provided that Eastwood would pay the Defendants $7,500. ECF 28 at 31. Defendants were required to (1) comply with the terms of the Preliminary Injunction Order in perpetuity, (2) dismiss the remaining counterclaim with prejudice within five (5) business days of payment, (3) dismiss the federal lawsuit against Eastwood with prejudice within five (5) business days of payment, (4) and dismiss all other complaints against Eastwood. *Id.* at 28-29.

Eastwood bargained for the benefit of two objectives by way of the Settlement Agreement: (1) protection against Defendants' wrongful campaign against Eastwood's business and reputation; and (2) protection against Defendants' malicious and vexatious litigation.

Because Defendants had a history of failing to comply with court orders, the Settlement Agreement also required Defendants to execute a confidential confession of judgment

("Confession of Judgment"). ECF 28 at 31. The Confession of Judgment would be kept confidential and would not be filed "unless and until an event of default occurs." *Id.*

Eastwood made a payment of $7,500 to Defendants. Defendants accepted the payment and never returned the payment. *See* ECF No. 3 ¶¶ 39-40; *see also* ECF No. 31-14, Ex. 1.

Defendants breached the settlement agreement days after signing by failing and refusing to dismiss the federal lawsuit. ECF No. 3 ¶ 40.

On January 10, 2024, Eastwood moved to enforce the settlement agreement, asking the court to, among other relief, (1) order Defendants to dismiss the Federal Lawsuit; and (2) declare that Eastwood was permitted to file the Confession of Judgment. ECF No. 3 ¶ 42.

In the time before the enforcement motion was set for hearing, Defendants began to make unjustified demands for additional money. The day after Eastwood filed the enforcement motion, Defendants emailed counsel for Eastwood and stated that they would dismiss the Federal Lawsuit, but it would "cost your client a few more concessions," including additional compensation of $17,500. *See* ECF 31-14, Ex. 1. Defendants made an additional demand of $17,500 on February 4, 2024, and an additional demand of $25,000 on February 7, citing the payment as a condition for dismissing the federal lawsuit. *See id.*, Exs 2, 3. Defendants repeatedly referenced the Federal Lawsuit as a "$25 million" case to threaten Eastwood into paying more money to Defendants to avoid judgment. *See id.*, Exs 3, 8. Defendants also repeatedly told Eastwood that Eastwood "won't collect a dime" if the enforcement motion was granted, *id.*, Ex. 4, and "[s]ounds like bankruptcy chapter 7 coming of [sic] needed." *id.*, Ex. 5; *see also id.*, Ex. 7 ("the judgment will ultimately be overturned thru the appellate Court and worse case written off by means of bankruptcy").

On March 22, 2024, the enforcement motion was granted ("Enforcement Order"). ECF No. 3-2.

8

On March 25, 2024, Eastwood filed Defendants' Confession of Judgment in the amount of $150,000. ECF No. 3-3 at 3. In the Confession of Judgment, Defendants explicitly (1) admitted that they were liable to Eastwood in the amount of $150,000 on Eastwood's claims for tortious interference with contract, interference with prospective economic advantage, defamation, breach of contract, and unfair and deceptive trade practices, ECF No. 3-3 at 2, 3; and (2) "acknowledge[d] that their liability to Eastwood is not subject to any defense, counterclaim, or offset"; and (3) "Defendants freely, knowingly, and voluntarily waive with prejudice any right they may have to appeal, modify, stay, or vacate this Judgment . . ." *Id.* at 4.

### VI.      Defendants pursue frivolous action against Eastwood and Eastwood's counsel.

Defendants did not comply with the Enforcement Order or Settlement Agreement. In the State Lawsuit, Defendants continued a frivolous appeal against Eastwood and eventually failed to prosecute it. *See* ECF No. 31-21. In the Federal Lawsuit, Eastwood moved to dismiss and enforce the Settlement Agreement. *See* ECF No. 31-22 at 1. After the federal court granted Eastwood's motion, Defendants also pursued a frivolous challenge of the federal court's order. *See* ECF No. 31-23 and ECF No. 31-24.

After Eastwood appeared in the instant proceeding, Defendants retaliated against Eastwood's counsel in the State Lawsuit and Federal Lawsuit. Defendants filed a grievance with the North Carolina State Bar against Eastwood's counsel based on the filing of the Confession of Judgment. *See* ECF 31-25. The grievance had no merit or foundation. *See id.*

Additionally, on November 13, 2025, Defendants directly emailed Eastwood's general counsel and indicated that they would be pursuing a malpractice claim against undersigned counsel. *See* ECF 31-26.

**VII.    Defendants communicated intent to violate the Enforcement Order and the Settlement Agreement.**

After the deadline to appeal the federal court's final order passed in the Federal Lawsuit, Eastwood filed a voluntary dismissal in the State Lawsuit on November 3, 2025.

On November 12, 2025, Defendants filed a notice of dissolution of injunction due to dismissal with prejudice ("Notice") in the now closed State Lawsuit. ECF No. 31-15. In the Notice, Defendants stated their intention to violate the injunction set forth in the Enforcement Order and the Settlement Agreement by claiming that the voluntary dismissal did not preserve any injunction and that the injunction provision in the enforcement order was dissolved by operation of law.

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment is appropriate pursuant to Fed. R. Bankr. 7056, incorporating Rule 56 of the Federal Rules of Civil Procedure, when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the litigation, and a dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party. *Estate of Sipes v. United States*, 2016 WL 109970, at *1 (MDNC Jan. 8, 2016) (*citing Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248 (1986)).

"The role of the court is not 'to weigh the evidence and determine the truth of the matter' but rather 'to determine whether there is a genuine issue for trial.'" *Ferrellgas, L.P. v. Best Choice Prods.*, 2017 WL 3142044, at *6 (MDNC July 24, 2017) (citation omitted). A genuine issue for trial exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

10

II.     **There is no genuine issue of material fact that Defendants acted willfully and with malice.**

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt attributable to "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The party challenging the dischargeability of a debt bears the burden of proving by a preponderance of the evidence that the debt is nondischargeable. *Lind Waldock & Co. v. Morehead*, 1 F. App'x 104, 106-07 (4th Cir. 2001). (*citing Grogan v. Garner*, 498 U.S. 279, 291 (1991). The Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Thus, "§ 523(a)(6) applies only to 'acts done with the actual intent to cause injury.' In other words, 'willful' means 'a deliberate or intentional act that is certain or substantially certain to cause injury.'" *In re Smith,* No. 05-10041, 2006 WL 3333801, at *10 (Bankr. M.D.N.C. Nov. 16, 2006) (cleaned up).

Additionally, the plaintiff must show malice, stated or implied. *See In re Kaufmann*, 669 B.R. 164, 173 (Bankr. D.S.C. 2024) ("A debtor's state of mind is irrelevant, and malice can be inferred through the debtor's acts and conduct in the context of surrounding circumstances."). "An act that is done deliberately and intentionally in knowing disregard of the rights of another would satisfy this implied malice standard." *In re McNallen*, 62 F.3d 619, 626 (4th Cir. 1995) (cleaned up); *see also In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994) (holding that "malice" means without just cause or excuse and requires no ill-will or specific intent to cause harm).

"Malice . . . does not mean the same thing in Section 523(a) that it often does in other contexts." *In re Stanley*, 66 F.3d 664, 667 (4th Cir. 1995) (cleaned up). "A debtor may act with malice even though he bears no subjective ill will toward, and does not specifically intend to injure,

11

his creditor." *Id.* Therefore, Section 523(a) eschews "specific malice or some other strict standard of malice." *McNallen*, 62 F.3d at 625 (cleaned up).

Here, Defendants *confessed to* their intentional and wrongful injury as part of their campaign to defame and harass Eastwood and its customers. Their posts, rallies, filings, and emails further show willful and malicious damage to Eastwood.

### A. There is no genuine issue of material fact that Defendants acted with willfulness.

First, the undisputed evidence shows that Defendants sought to hurt Eastwood. From the very beginning, when Mr. Bryant spoke with the Eastwood sales agent at the model home, he told her that if he did not get what he wanted, he would make it difficult for Eastwood to build and sell homes in Piper Village. ECF No. 31-3, ¶17. Moreover, Mrs. Bryant explicitly acknowledged and celebrated the harm. The Verified Complaint attaches an email sent by Mrs. Bryant after Defendants led the rally:

> In closing, we are winning the fight! One potential buyer has already cancelled her contract to build and another is strongly considering the same! We will continue to fight until justice is done!

ECF No. 31-1 ¶ 30 and Ex. D at 2. In a case where there was evidence that the defendant had interfered with plaintiff's contractual relations, the court noted that whether the defendant "actually intended to cause financial harm to [the plaintiff] . . . is not the issue; rather, it is the fact that [the defendant] knew that financial harm would result to [the plaintiff] as a natural consequence of his intentional acts." *In re Janssens*, 449 B.R. 42, 78-79 (Bankr. D. Md. 2010), *aff'd sub nom. Janssens v. Freedom Med., Inc.*, No. CIV. JFM-10-2042, 2011 WL 1642575 (D. Md. Apr. 29, 2011). Likewise, Mrs. Bryant's statements in her email and Mr. Bryant's statements affirmatively establish that they both knew their actions would cause harm to Eastwood. There is therefore no genuine dispute of material fact that Defendants intended to cause harm to Eastwood.

12

Second, the record shows that Defendants engaged in conduct, including defamation and tortious interference of contract, that, as a matter of law, satisfy the element of willfulness.

Evidence of false and defamatory statements with an intent to harm is sufficient to show willfulness. *See In re Jones*, 655 B.R. 868, 878–79 (Bankr. S.D. Tex. 2023) (granting summary judgment in favor of plaintiff on willful and malicious injury claim where there was a default judgment in the underlying case and the petition alleged that the defendants coordinated harassment against the plaintiffs with defamatory statements that "were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule, or attack."); *In re Lager*, No. 22-30072-MVL-11, 2023 WL 4676067, at *16 (Bankr. N.D. Tex. July 20, 2023) (granting summary judgment in favor of plaintiff on willful and malicious injury claim where the summary judgment record was "replete with evidence of numerous instances of [defendant] directly posting to his own personal social media account disparaging content and defamatory comments about [defendant], its executives, and their purportedly racist and abusive business practices."); *In re Fisher*, No. 16-12991-ABA, 2017 WL 590306 (Bankr. D.N.J. Jan. 24, 2017). For example, in *Fisher*, the court ruled for plaintiff on summary judgment regarding debt owed as a result of willful and malicious injury. 2017 WL 590306, at *8. The defendant had disseminated false allegations about the plaintiff through public picketing, other social media, and to government entities and clinics. *Id.* The court found that the defendant had to be "substantially certain that naturally a harm would result." *Id.* Moreover, plaintiff had informed the defendant of the damage, "[t]hus she then had to be aware that her continued deliberate actions caused injury." *Id.*

Evidence of tortious interference with contract is also sufficient to show willfulness. *See, e.g.*, *In re Franklin*, No. 24-10231-CLH, 2025 WL 601310, at *6 (Bankr. M.D. Ala. Feb. 24, 2025) ("Because judgment was entered on the intentional tort of conversion in the Michigan Lawsuit and

13

the facts supporting that judgment are entitled to preclusion in this Court, the judgment debt is non-dischargeable."); *In re Catapano*, No. 20-30134 (AMN), 2024 WL 829542, at *11 (Bankr. D. Conn. Feb. 27, 2024) (granting summary judgment on willful and malicious injury claim); *In re Janssens*, 449 B.R. at 78–79 (entering judgment after trial in favor of plaintiff on its willful and malicious injury claim).

Indeed, the Confession of Judgment establishes that Defendants ran a "coordinated campaign to damage Eastwood's business and reputation" by defamation and tortious interference of contract. *See* ECF No. 3-3, ¶ 6. Specifically:

> The Bryants approached Eastwood's customers and made negative comments about Eastwood, placed defamatory signs on their yards, and made defamatory social media posts.

*Id.* Further:

> The Bryants' conduct caused Eastwood to lose at least one contract for the purchase of a lot and home in Piper Village. Eastwood suffered damages in the amount of at least $74,400 in profit on the sale of the lot and home.

ECF No. 3-3, ¶ 7; *see also* ECF No. 31-11, ¶¶ 9-16. The Bryants ultimately admit to damages of $150,000, *Id.* ¶ 13, which would include the unquantifiable damage Defendants caused to Eastwood's reputation. Defendants cannot revoke or deny their own sworn admissions that they engaged in coordinated activity to cause harm to Eastwood's business and reputation and, in fact, caused harm to Eastwood.

The State Lawsuit record also shows the coordinated campaign, which implies willfulness. Debtors' campaign relied primarily on making and distributing false and defamatory statements about Eastwood on signs posted in front of their house, ECF No. 31-1 ¶¶ 15; ECF No. 31-5 ¶ 6-7; ECF No. 31-7, ¶10; ECF No. 31-8 , on social media posts, ECF No. 31-1 ¶¶ 15, 22-23, 34-35; ECF No. 31-6 ¶14, ECF No. 31-7, ¶10, oral statements at a rally where Mr. Bryant brandished a weapon,

14

ECF No. 31-1, ¶¶ 22-27., and critically, oral statements made to customers and potential customers visiting the neighborhood with their relators, ECF No. 31-1, ¶ 17. Such statements included:

(1) "EASTWOOD SLAVE VILLAGE" and "Let me remind you that evil people are still around and Jim Crow is still practiced and alive and well. . . ." ECF No. 31-1 ¶ 34,

(2) Falsely accusing Eastwood of violating laws, ECF No. 31-1, ¶¶ 22, 34;

(3) Blaming Eastwood for issues in the neighborhood that were not within Eastwood's control, ECF No. 31-1, ¶¶ 22, 34; ECF No. 31-7 ¶6

(4) Falsely accusing Eastwood of mistreating homeowners, *id.* ECF No. 31-1, ¶¶ 22, 34; ECF No. 31-6 ¶ 15; and

(5) Falsely accusing Eastwood of harassing Defendants, ECF No. 31-1, ¶ 34;

As in *Fisher*, Defendants intentionally spread false statements about Eastwood through various mediums and knew that their actions would cause harm to Eastwood. That was their intent. Eastwood even warned Defendants of this potential harm. ECF 31-1, Ex. B at 2-3.  Defendants also intentionally targeted Eastwood's customers and potential customers. Mr. Bryant approached an Eastwood customer and her realtor, who was under contract to purchase a home in Piper Village, and made negative comments about the neighborhood. ECF No. 3-1 ¶ 21. The customer was also frightened by Mr. Bryant's aggressive manner and disturbed by Defendants' signs, including "EASTWOOD SLAVE VILLAGE." *Id.* Because of Defendants' actions, this customer pulled her contract and did not purchase property in Piper Village. *Id.*

Finally, Defendants' debt arises out of their pursuit of vexatious litigation against Eastwood. Throughout the State Lawsuit and Federal Lawsuit, their modus operandi was to file motions without any basis in law or fact and delay execution of any adverse order. Defendants never succeeded in any of their motions or abusive litigation tactics and the Court ordered

15

Defendants to pay attorneys' fees on two separate occasions. *See* ECF No. 3, ¶ 43; ECF No. 3-2; ECF No. 31-17; ECF No. 31-18; ECF No. 31-19; ECF No. 31-20; ECF No. 31-21; ECF No. 31-22; ECF No. 31-23; ECF No. 31-24. Defendants violated court orders and communicated disdain for the judges issuing those orders. Defendants even pleaded guilty to indirect criminal contempt for violating a court order in the State Lawsuit, *See* ECF No. 31-10, and did not succeed in their appeal. *See State v. Bryant,* 297 N.C. App. 579, 909 S.E.2d 806 (2024), *writ denied,* 916 S.E.2d 255 (N.C. 2025), *and writ denied,* 916 S.E.2d 259 (N.C. 2025), *and review denied,* 916 S.E.2d 262 (N.C. 2025), *and review denied*, 916 S.E.2d 262 (N.C. 2025), *and appeal dismissed*, 916 S.E.2d 262 (N.C. 2025), *and appeal dismissed*, 916 S.E.2d 263 (N.C. 2025).

Eastwood sought to end Defendants' campaign of tortious interference and vexatious litigation by way of the Settlement Agreement and bargained for the dismissal of the State Lawsuit and Federal Lawsuit, as well as the complaints to other entities. After the Settlement Agreement was filed, Defendants continued their campaign of vexatious litigation by challenging Eastwood's motions to enforce the settlement agreements – a process that continued for over a year-and-a-half until October 30, 2025. *See* ECF No. 31-21; ECF No. 31-22; ECF No. 31-23; ECF No. 31-24. Defendants' emails show that their main objective in continuing the challenge was because they believed they could get Eastwood to hand over more money – in addition to the $7,500 they received and never returned. ECF 31-14, Exs. 1-3. These were not good-faith settlement communications, but extortion. Their intent to extract more money from Eastwood by way of continued, baseless, litigation that violated the Settlement Agreement is clear evidence of willfulness and their complete disregard for the rule of law, court orders, and the judges who presided over these matters.

16

Moreover, it was always Defendants' intent to avoid liability under the Confession of Judgment not only by way of their frivolous challenges, but their use the bankruptcy process. On more than one occasion, in email and in oral statements, Defendants told counsel for Eastwood that Eastwood would never collect a judgment because they would file a bankruptcy petition. *See, e.g.*, ECF 31-14 at Exs. 4, 5, and 7. It is now clear that Defendants intend to violate the Enforcement Order and the Settlement Agreement by their recent filing of the Notice stating that there is no injunction against them. The evidence is clear that Defendants continue to act with intent to harm Eastwood.

In light of Defendants' explicit admissions and the undisputed evidence in the Record, Eastwood has more than met its burden in showing that there is no genuine issue of material fact that Defendants acted "willfully."

**B.  There is no genuine issue of material fact that Defendants acted with malice.**

The undisputed evidence shows that Defendants acted without just cause or excuse and in knowing disregard of Eastwood's rights. In *Janssens*, the court found that there was evidence of malice because the defendant "provided no justification for his conduct," *Janssens*, 449 B.R. at 79, despite the fact that the defendant testified that "he was protecting [plaintiff employer] by diverting to [a competitor] those types of business or services in which [plaintiff employer] was either not interested or was unable to perform." *Id.* at 59. The defendant had also admitted that he knew that such transactions and work should have been disclosed to the plaintiff. *Id.*

Here, Defendants had no just cause to advance a campaign against Eastwood. They knew that their complaints and concerns had nothing to do with Eastwood. ECF No. 31-1, ¶ 15. General counsel for Eastwood had explained that the matters Defendants raised were not within the control of Eastwood and directed Defendants to bring their Covenants concerns to the HOA and their

17

warranty concerns to the online warranty system. *Id.*; *see also id.* Ex. B at 4. Eastwood repeatedly warned Defendants that they were spreading false and misleading information about HOA in connection with Eastwood's name. *Id.* Ex. B at 3. The Randolph County Superior Court entered findings of fact that the Developer and City of Trinity were responsible for the issues Defendants complained of. ECF Nos. 31-3 ¶¶ 3-13; *see also* ECF No. 31-12 ¶¶ 1-7. That was the point: Defendants knew they were falsely blaming Eastwood and spreading misinformation to the public. *See* ECF No. 31-1 at 1-2.

The Randolph County Superior Court agreed with Eastwood that Defendants had no just cause to interfere with Eastwood's business. It entered three separate orders prohibiting Defendants from engaging in the following actions:

a.      Harassing, threatening, or otherwise approaching Eastwood's customers and prospective customers. The term "Customers" shall not include individuals who have previously closed on the purchase of a home in Piper's Village;

b.      Brandishing a gun, firearm, or other weapon in connection with any act which is intended, or could reasonably be inferred, to disrupt or harm Eastwood's business;

c.      Making statements regarding Eastwood to any persons who have agreed to buy or are considering buying a home from Eastwood;

d.      Entering on any property owned by Eastwood, for any purpose, without permission;

e.      Harassing, threatening or otherwise approaching employees, vendors or contractors of Eastwood;

f.      Brandishing a gun, firearm, or other weapon while approaching employees, vendors or contractors of Eastwood;

g.      Making disparaging and/or defamatory statements regarding Eastwood, either directly or indirectly;

h.      Posting videos or statements defaming Eastwood or casting Eastwood in a false and negative light on Facebook, Tik Tok, or on any other social media site accessible via the Internet;

18

i.       Using Eastwood's name, or any variation of Eastwood's name, in connection with any statement which is intended, or could reasonably be inferred, to disrupt or harm Eastwood's business without written approval;

j.       Distributing or placing fliers, signs, or any other written material defaming Eastwood or casting Eastwood in a false and negative light, or causing or directing such fliers, signs, or written material to be distributed or placed;

k.       Conducting rallies or other gatherings designed to incite Eastwood's employees, agents or customers; or to harass Eastwood's customers, agents and employees, and

l.       Engaging in any other act or practice intended to harm Eastwood's business and/or reputation.

*See* ECF Nos. 3-2, 31-1, 31-3. Defendants continued to violate these court orders and make false and disparaging statements about Eastwood, including to its customers. *See* ECF No. 31-4; ECF No. 31-5; ECF No. 31-6; and ECF No. 31-8. Defendants even consented to entry of orders of indirect criminal contempt for violation of two of these orders. *See* ECF No. 31-10. Yet, they continued to pursue frivolous motions, lawsuits, appeals, and complaints against Eastwood and its counsel for over two years and in violation of the Settlement Agreement.

Any argument that Defendants thought their statements were true is inapposite. In *In re Ellerbee*, 177 B.R. 731 (Bankr. N.D. Ga. 1995), *subsequently aff'd sub nom. Ellerbee v. Mills*, 78 F.3d 600 (11th Cir. 1996), the defendant "refuse[d] to give an inch on his position that his statements were true." *Id.* at 743. Despite this, the court held that the plaintiff had met his burden to show there was no just cause for the wrongful actions by showing that the defendant "repeatedly defamed him by making statements as to which [the defendant] had a high degree of awareness of their probable falsity," and that the defendant "refused to stop making the statements even after being warned that the statements were defamatory and when he knew that the statements tended to injure [the plaintiff's] reputation" *Id.* at 743. Here, the evidence shows that Defendants were

19

told repeatedly that Eastwood was not in control of the issues and concerns Defendants raised. Defendants cannot put forth any evidence to challenge the conclusion that their wrongful campaign against Eastwood had no just cause. The Court should find, as a matter of law, that Eastwood is entitled to summary judgment.

### III.   Defendants are estopped from challenging the Confession of Judgment.

The doctrines of quasi-estoppel or estoppel by benefit, estoppel by confession, and collateral estoppel apply, and Defendants cannot challenge their admissions in the Confession of Judgment.

#### A. Defendants accepted the benefits of the Settlement Agreement and thus cannot challenge the Confession of Judgment.

Defendants cannot take a position inconsistent with the prior acceptance of the Settlement Agreement and Confession of Judgment. North Carolina courts recognize a breach of equitable estoppel known as "quasi-estoppel" or "estoppel by benefit." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 18 (2004). Under a quasi-estoppel theory, "a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument." *Id.* "In comparison to equitable estoppel, quasi-estoppel is inherently flexible and cannot be reduced to any rigid formulation." *Id.*

For example, in *Cleveland Const., Inc. v. Ellis-Don Const. Inc.*, 210 N.C. App. 522 (2011), plaintiff had entered into a subcontract with the defendant where the plaintiff received periodic payments in exchanged for its certified "acknowledg[ment]" that, when it submitted its application, it had "no unsettled change order requests or claims" against the defendant. *Id.* at 530. The North Carolina Court of Appeals concluded that "[h]aving received periodic payments based on the applications submitted, [the plaintiff] is now precluded from asserting the claims which it expressly "acknowledge[d]" that it did not have as a condition of payment." *Id.*

20

Here, Defendants accepted the benefits of the Settlement Agreement – Eastwood's payment of $7,500. Defendants thereafter refused to comply with the performance terms under the Settlement Agreement and did not return Eastwood's payment when they alleged that the Settlement Agreement was invalid. *See* ECF No. 31-14, Exs. 1 and 2. In fact, Defendants began to demand additional payment from Eastwood. *Id.*, Exs 2, 3. The Settlement Agreement provided that Defendants' refusal to comply with the performance terms would result in the filing of the Confession of Judgment. Because Defendants accepted the benefits of the Settlement Agreement they are now estopped from challenging the burdens they agreed to take on—such as the admissions they made in the Confession of Judgment.

**B.  Defendants cannot impeach their own confession.**

Longstanding North Carolina precedent is clear that Defendants are estopped from challenging the validity of their own judgment confessed.

For example, in *Peace v. Mangum*, 28 N.C. 369 (1846), a debtor executed two bonds judgment with language stating, "By confession of the defendant judgment is granted for eighty dollars. Given under my hand this 17th April, 1841, with interest from the 20th February last." *Id.* at 372. The second bond was identical, except the amount was for $78.80 instead of $80. The North Carolina Supreme Court held affirmed the decision that the judgments were not void and that they should be collected upon. *Id.* at 375. It reasoned,

> It seems to us, that there was no other evidence necessary to substantiate the truth of the allegations made upon the face of each warrant, and that the justice had jurisdiction and was bound in law to render the judgments he did.

*Id.* at 374.

In *J.S. Martin & Son v. Briscoe*, 143 N.C. 353 (1906), the defendant had confessed judgment by affidavit in favor of the plaintiff in a specific amounts due arising from bills of goods

21

and groceries. *Id.* The defendant later contended that his affidavit was not sufficient to authorize

entry of judgment. *Id.* The North Carolina Supreme Court did not permit the defendant to impeach

his own affidavit. *Id.* The court issued its decision "upon the ground of estoppel," citing

> the original affidavit by defendant that the debt was due the plaintiff, his acquiescence in the judgment for six years, his failure in this proceeding to deny the plaintiff's allegation (made under oath) that the debt is still due, the absence of any averment by defendant of fraud, mistake, or imposition, and the fact that, if the judgment should be now held invalid, at defendant's instance, for informality, after having been entered at defendant's request, he would be protected by the statute of limitation.

*Id.*

Additionally, in *Pulley v. Pulley*, 255 N.C. 423 (1961), the defendant executed a confession

of judgment where he confessed to owing a specific amount of monthly alimony to his wife and

certain facts leading to their separation. *Id.* at 425. The defendant tried to challenge the validity of

his own confession of judgment. *Id.* at 428. Like the court in *J.S. Martin*, the North Carolina

Supreme Court held that the defendant was "estopped to question the validity of his own confessed

judgment for alimony . . . and to question that the entry of judgment by the court on the confessed

judgment is a court order to pay alimony." *Id.* at 432.

The North Carolina Supreme Court in *Pulley* also quoted *Johnson v. Alvis*, 159 Va. 229,

165 S.E. 489, 490 with approval: "A defendant confessing judgment is estopped, in the absence of

fraud, to question its validity on account of irregularities to which he did not object, or to dispute

any facts set forth in the confession." *Pulley*, 255 N.C. 423 at 430 (quoting *Johnson* and collecting

many other cases standing for the same point).

The North Carolina cases on estoppel by confession are consistent with general view

around the country that "[i]n determining whether issues decided by consent decree or by

stipulation are to be given preclusive effect, the intent of the parties concerning preclusive effect

22

of the agreed facts is relevant. Thus, collateral estoppel or issue preclusion is appropriate if it is clear that the parties intended it as part of their agreement, but consent judgments do not have issue preclusion effect unless such intent is clearly manifested or reflected. When it can be said that the parties could reasonably have foreseen the conclusive effect of their actions, collateral estoppel may apply to issues underlying consent judgments." 50 C.J.S. Judgments § 1051; *See also In re Burress*, 245 B.R. 871 (Bank. Col. 2000) (estopping debtor from challenging confession under facts similar to this case).

Here, the entire point of the confession and settlement was to provide finality for Eastwood to end the Debtors' multi-year campaign against Eastwood in and outside of the judicial system and quasi-judicial system. Defendants executed the Confession of Judgment admitting to a specific amount of liability and the facts that gave rise to the liability. Defendants have not and cannot contend that the Settlement Agreement was procured by fraud, mistake, or imposition – particularly where Defendants failed to contest the validity of the Settlement Agreement in the State Lawsuit and never returned the benefit – Eastwood's payment – arising from the Settlement Agreement. And, Defendants cannot reasonably say that they did not know they would be bound to the admissions in the Confession that were designed to provide finality between the parties. Defendants cannot impeach their own admissions, made under oath, regarding their liability to Eastwood and the amount of damages.  Estoppel by confession applies and summary judgment is appropriate.

### C.  Defendants are collaterally estopped from litigating the issue of willfulness.

Collateral estoppel, also referred to as issue preclusion, "precludes re-litigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted had a full and fair opportunity to litigate that issue in an earlier

proceeding." *In re Peterson*, No. 17-10066, 2018 WL 5883913, at *4 (Bankr. M.D.N.C. Nov. 6, 2018) (citation omitted). "In determining the preclusive effect of a state-court judgment, the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel." *Id.* (citation omitted).

Under North Carolina law, issue preclusion, also known as "collateral estoppel" and "estoppel by judgment," prohibits re-litigation of an issue resolved in a final judgment "involving identical parties or parties in privity with a party or parties to the prior suit." *State v. Safrit*, 145 N.C. App. 541, 552 (2001) (quoting *Masters v. Dunstan*, 256 N.C. 520, 524 (1962) (cleaned up)). Issue preclusion requires: "(1) a prior suit resulting in a final judgment on the merits; (2) identical issues involved; (3) the issue was actually litigated in the prior suit and necessary to the judgment; and (4) the issue was actually determined." *McDonald v. Skeen*, 152 N.C. App. 228, 230 (2002).

The issues of whether Defendants acted with intent to cause harm and actually caused harm to Eastwood, or "willfulness" has already been decided in the State Lawsuit when the Confession of Judgment was filed. As an initial matter, the State Lawsuit included a final judgment on the merits – the Confession of Judgment. The State Lawsuit also involved identical issues because the claims were premised on acts constituting willful and malicious injury. *See In re Jones*, 655 B.R. 868, 878 (Bankr. S.D. Tex. 2023) ("'Willful and malicious injury' does not need to be the exact label on the issue litigated in state court for a bankruptcy court to assess whether the debt from a state court action was based on acts constituting willful and malicious injury for purposes of § 523(a)(6). . . . Instead, the analysis focuses on whether the state court made specific findings about an injury to a plaintiff that meets the test for willful and maliciousness under § 523(a)(6)").

Moreover, the issues of whether Defendants engaged in actions constituting willful and malicious injury were litigated in the prior suit. The parties engaged in discovery, filed and argued

24

motions for a preliminary injunction and injunction pending appeal, filed and argued motions for sanctions, filed and argued motions to dismiss under Rule 12(b)(6), and filed and argued summary judgment motions. The state court decided all of these motions after hearings. The parties then decided to end the litigation by confession and settlement. When the Debtors did not comply, Eastwood filed an enforcement motion asking the state court to enter an order allowing Eastwood to file the Confession of Judgment. The state court granted the enforcement motion and directed Eastwood to file the Confession of Judgment. Just as in *Peterson*, the Defendants participated in this litigation at every step and they are now bound by collateral estoppel to the result.

Finally, the issue of whether Defendants engaged in actions constituting willful injury was actually decided. The Confession of Judgment contained findings of fact relating to Defendants' wrongful conduct, intent to cause harm, and resulting harm. The Confession of Judgment contains a finding of fact that "the Bryants began a campaign to damage Eastwood's business and reputation in the neighborhood and on social media" and "approached Eastwood's customers and made negative comments about Eastwood, placed defamatory signs on their yards, and made defamatory social media posts." ECF No. 3-3, ¶ 6. The Confession of Judgment also includes findings of fact relating to the damage the Bryants caused Eastwood. *See* ECF No. 3-3, ¶¶ 7; 12-14, 16. Defendants cannot challenge the issues already decided in the State Lawsuit as set forth in the Confession of Judgment.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in Eastwood's favor on its claim for willful and malicious injury under 11 U.S.C. § 523(a)(6).

This the 14th day of November, 2025.

/s/ Katarina K. Wong

Clint S. Morse
  NC Bar No. 38384
  cmorse@brookspierce.com
Jamey M. Lowdermilk
  NC Bar No. 52271
  jlowdermilk@brookspierce.com
Katarina K. Wong
  NC Bar No. 55040
  kwong@brookspierce.com
BROOKS, PIERCE, MCLENDON,
  HUMPHREY & LEONARD, LLP
230 North Elm Street, Suite 2000
Greensboro, NC  27401
Phone: 336.271.3167
Fax:    336.232.9167

*Attorneys for Creditor Eastwood Construction Partners, LLC*

26

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief in Support of the Motion for Summary Judgment was served on all parties who have made an appearance in the above captioned bankruptcy case by filing with the Court's CM/ECF system and by mailing as shown below.

James Lawrence Bryant, Jr.
Sharon Renea Bryant
5629 Siler Street
Trinity, NC  27370
jlbryantjr11@gmail.com
srblackmon@hotmail.com
*Debtors via Email and Certified Mail with Return Receipt*

John Paul Hughes Cournoyer
*Bankruptcy Administrator via CM/ECF*

Vicki L. Parrott
NORTHEN BLUE, LLP
1414 Raleigh Road, Suite 435
Chapel Hill, NC  27517
vlp@nbfirm.com
*Trustee via Email and First-Class Mail*

This the 14th day of November, 2025.

/s/  Katarina K. Wong